ITHAMER C. STEPHENS V. OMAHA & REPUBLICAN VALLEY RAILWAY COMPANY.

FILED JUNE 6, 1894.    No. 5374.

1. **Negligence**: RAILROADS: EVIDENCE. Railroads cannot be operated without noise; and if teams are frightened by the usual noise arising from a prudent and proper management of a train or engine, the railroad company is not liable for an injury resulting from said noise; and whether the noise complained of resulted from a prudent operation of the railroad or its appliances is a question to be determined from the circumstances and other evidence in the case. That the noise complained of was unnecessarily made is not of itself evidence that its making was negligence. To be evidence of negligence the noise must have been made under such circumstances and surroundings as to time, place, and situation of the parties as to show neglect to exercise that degree of care which a reasonable man would have exercised under the circumstances. *Omaha & R. V. R. Co. v. Brady*, 39 Neb., 27, followed and reaffirmed.

2. ———: ———: ———. The evidence in this case examined, and *held* to support the finding of the jury that the proximate cause of the injury to plaintiff was his own negligence and not the negligence of the agents of the defendant in error.

ERROR from the district court of Saunders county. Tried below before BATES, J.

*Clark & Allen* and *Simpson & Sornborger*, for plaintiff in error.

*J. M. Thurston, W. R. Kelly*, and *E. P. Smith, contra.*

RAGAN, C.

Ithamer C. Stephens sued the Omaha & Republican Valley Railway Company in the district court of Saunders county for damages for an injury which he alleged he sustained through the negligence of the agents of said

company. The railway company had a verdict and judgment, and Stephens brings the case here on error.

The material facts in the case, summarized, are as follows: The main track of the railway company passes east and west through the village of Valparaiso and crosses at right angles and at grade Cedar street, running north and south in said village. Near the track of said railway company, and about four hundred feet west of the point where it crosses Cedar street, the company has a coal chute elevated above the surface of the ground some twenty feet. From this coal chute, at a sharp incline, a track descends, parallel with the main track and close to it until near Cedar street, which it then crosses on a level with the main track. This incline track is used for the purpose of pushing cars loaded with coal into said chute, where the coal is dumped and the empty cars, in charge of a brakeman, are run down the incline track and stored on switches. In the year 1890 Stephens was a resident of the village of Valparaiso and had been for some years. He was engaged in said village and surrounding country in the practice of medicine and surgery. He was well acquainted with the crossing or intersection of Cedar street and the railroad company's tracks. He had frequently passed over said crossing. He was well acquainted with the incline track from the crossing to the coal chute and the manner in which and the purposes for which such incline track was used. A person driving north on Cedar street, and approaching the said crossing from the south, would have an unobstructed view of said coal chute and incline track for a distance of at least three hundred feet before reaching the crossing. On the 7th of May, 1890, the same being a clear, bright day, Dr. Stephens was driving north on Cedar street towards said crossing. He was riding in a two-wheeled cart drawn by one horse. As he approached the crossing he did not look or listen for cars or engines on the railroad tracks or

the incline track until within some sixteen feet of the crossing. He then looked west toward the coal chute and saw an empty car, with a brakeman on it, descending the incline track. His horse was not frightened. He had ample time to stop until the car passed over the street in front of him. He could easily have turned his horse and cart around and driven back south. At the time he first observed the car descending the incline track it was some three hundred and fifty feet from the crossing, and the doctor thought he had ample time to drive across the tracks before the car should reach the street. He whipped up his horse and crossed the tracks safely. After he had passed over the tracks the car came down across the street behind him and his horse took fright at the noise made by the car, ran away, and the doctor was thrown out and injured. The brakeman on the descending car saw the doctor and knew him at the time he whipped up his horse to drive across the tracks. The brakeman observed that the horse was not frightened. He saw that the doctor could and had passed over the track safely on which the car was descending and he made no effort to stop the car or slacken its speed.

1. The first error assigned here is that the court erred in giving the fourth, fifth, sixth, seventh, and eighth paragraphs, and each of them, of instructions given by the court to the jury on its own motion. These instructions are too long to be quoted in this opinion and it would subserve no useful purpose to copy them, or any of them, and it must suffice to say that the instructions complained of stated the law correctly and there was no error in giving them, or either of them.

2. The second error assigned is that the court erred in giving paragraph No. 7 of instructions given by the court at the request of the railroad company. That instruction is as follows: "The jury are instructed that every intelligent man is supposed to know that a railway crossing is a

dangerous place, and in approaching the same he must exercise corresponding caution in crossing it. A traveler should always approach a railroad crossing under the impression that a car or train is liable to come at any moment, and while he may presume that those in charge of it will use ordinary precautions to avoid injury, yet the law requires him to obey the instincts of self-preservation and not carelessly or without precaution thrust himself into a situation of danger which, notwithstanding any failure of the railroad company, he should have avoided by carefully using his senses. He should not only look but is required to listen for the noise of any approaching train or any signal which might be given to avoid it; and if he omits this, goes upon the crossing and is injured, he cannot recover." This instruction should not have been given. It is true that a party should not go upon a railway crossing without looking, if he have eyes, nor without listening, if he is not deaf; but if he does go upon the crossing without either looking or listening, it is for the jury to say whether by so doing he was guilty of negligence, all the facts and circumstances in the case and the time and place considered. There is omitted from this instruction a very material ingredient, viz., whether the failure of the doctor to look and listen before going upon the track was the proximate cause of his injury; or notwithstanding his failure to look and listen the negligent conduct of the railway company was the proximate cause of his injury. By the seventh paragraph of the instructions given the jury by the court at the request of the doctor the jury were told: "That if the plaintiff was himself guilty of negligence which contributed to the injury and without which the accident would not have happened, still the defendant would be liable in this case, provided the jury believed from the evidence that the servants of the defendant saw, or could have seen with ordinary diligence, the danger to which plaintiff was exposed in time to have avoided it and by the exercise of ordinary care and

prudence could have prevented the injury." This charge of the court, given at the request of the doctor, cured the error in the instruction No. 7 complained of given at the request of the railway company. We think further, that the instruction complained of, though erroneous, was not prejudicial to Dr. Stephens. The instruction said that the doctor was required to look and to listen for the noise of an approaching train or car before he went upon this crossing, and that if he had failed to do so and was injured, he could not recover. The undisputed evidence at the trial was that the doctor did look and listen before going upon the crossing, and not only that but he saw and heard the descending car. The jury, then, could not have based their finding in this case against the doctor on his failure to look and listen before he went upon the track.

3. The third error assigned is the giving by the court to the jury at the request of the railway company instruction No. 8, as follows: "The jury are instructed that the defendant's agent in charge of the car was not expected to know that the plaintiff's horse, if such was the case, was fractious or easily frightened at the sight or moving of railroad cars; but had the right to assume that, like most horses, it had become accustomed to the sight and motion of cars and that the plaintiff was aware of that fact and so was driving it in the vicinity of the crossing and car. If the plaintiff knew or suspected his horse to be liable to be frightened and then attempted to drive his horse close to the defendant's car or over the tracks, he did so at his own risk and took the chance of his getting across the track and at such a distance beyond that his horse would not be frightened, and if he failed in this, it would be his own fault and he could not recover." The criticism on this instruction is that by it the court told the jury that the brakeman on the car had a right to assume that the doctor's horse, like most horses, had become accustomed to the sight and motion of the cars. The instruction is not very hap-

pily framed; but when read in the light of the evidence in
the case it was not erroneous.   As already stated, the evi-
dence showed that the doctor, before he went on the cross-
ing, saw the brakeman and the descending car.   His horse
at this time evinced no evidence of being frightened.   The
brakeman knew the doctor and saw him before he went
upon the crossing and observed that his horse was not
frightened.   It was with this evidence in his mind that the
court gave the instruction complained of to the jury; and
correctly told the jury that the brakeman on the car, seeing
the doctor so near the crossing, and seeing him about to
drive over when he had ample time to turn and go back,
and seeing that his horse was not frightened, had a right to
assume that the horse was not afraid of the noise of the car.

4. The remaining errors will be considered under the
assignment that the verdict of the jury is not sus-
tained by sufficient evidence.   This verdict of the jury
may be based upon their finding, either that the injury
sustained by Dr. Stephens was not caused by the negli-
gence of the railway company, or that the doctor's injury
was caused by his own negligence; and if the jury's ver-
dict is based on either of these conclusions, it is correct.
It is not disputed but that the doctor was injured.   He
was injured because his horse became frightened and ran
away, and his horse was frightened at the noise of a de-
scending car.   But while it may be said that there is some
evidence in the record which tends to show that the noise
which frightened the doctor's horse was unnecessarily made,
we think the jury was entirely right in finding, if they did
so find, that the noise which frightened the doctor's horse
was not negligently made by the railway company.   "Rail-
roads cannot be operated without noise, and if teams are
frightened by the usual noise arising from a prudent and
proper management of a train or engine, the railroad com-
pany is not liable for an injury resulting from such noise;
and whether the noise complained of resulted from a pru-

dent operation of the railroad or its appliances is a question to be determined from the circumstances and other evidence in the case.    That the noise complained of was unnecessarily made is not of itself evidence that its making was negligence.    To be evidence of negligence the noise must have been made under such circumstances and surroundings as to time, place, and the situation of the parties as to show a neglect to exercise that degree of care which a reasonable man would have exercised under the circumstances." (*Omaha & R. V. R. Co. v. Brady*, 39 Neb., 27.)   In the case at bar, the brakeman, when he first saw the doctor and observed that he intended to cross the tracks, was 325 feet from him.   He observed that his horse was not frightened. Now, at this time, the brakeman could have applied the brakes to his car and stopped it and kept it at that distance from the street until the doctor had passed so far beyond the crossing that there would be no reasonable probability that his horse would be frightened by the noise of the car descending behind him.   Had the brakeman exercised this extraordinary care, doubtless the doctor would not have been injured.   But it was for the jury to say from all the facts and circumstances in the case whether the brakeman, by not setting his brake and not stopping the car when he first observed the doctor, and keeping the car stationary until the doctor had gotten a considerable distance beyond the crossing, and whether the brakeman, in allowing the car to run down the incline track at the speed and making the noise it did, failed to exercise ordinary care; that is, whether the acts and omissions of the brakeman rendered him guilty of negligence.   The jury by its verdict has said that the acts and omissions of the brakeman were not negligent ones under the circumstances, and the evidence justifies their conclusion.   But it is suggested in argument here by counsel for Dr. Stephens that the evidence is undisputed that the brakeman on the descending car saw the doctor; saw that he was intending to cross and pass over

the crossing, in ample time to have brought his car to a standstill until the doctor should be so far away from the crossing that there would be no probability of his horse becoming frightened at the noise of the car, and that, therefore, the court should say, as a matter of law, that the conduct of the brakeman under the circumstances was negligence. We do not think that it is for the court to say as a matter of law what conclusion should be drawn from this evidence.

We agree with Mr. Justice Hunt in *Sioux City & P. R. Co. v. Stout*, 17 Wall. [U. S.], 657, where he uses this language: "Certain facts we may suppose to be clearly established from which one sensible, impartial man would infer that proper care had not been used and that negligence existed; another man, equally sensible and equally impartial, would infer that proper care had been used and that there was no negligence. It is this class of cases and those akin to it that the law commits to the decision of a jury. Twelve men of the average of the community, comprising men of education and men of little education, men of learning and men whose learning consists only in what they have themselves seen and heard,—the merchant, the mechanic, the farmer, the laborer,—these sit together, consult, and apply their separate experience of the affairs of life to the facts proven, and draw a unanimous conclusion. This average judgment, thus given, it is the great effort of the law to obtain. It is assumed that twelve men know more of the common affairs of life than does one man; that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge." The judgment of the district court is

AFFIRMED.